John Gilbert **MARTINEZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–02–00329–CR.

Court of Appeals of Texas,
San Antonio.

Sept. 17, 2003.

Rehearing Overruled Oct. 23, 2003.

Fred G. Rodriguez, Suzanne M. Kramer, Michael A. Ramos, San Antonio, TX, for Appellant.

Daniel Thornberry, Assistant Criminal District Attorney, San Antonio, TX, for Appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by CATHERINE STONE, Justice.

Appellant John Gilbert Martinez was found guilty of the offense of capital murder. He was 15 years old at the time of the offense and was certified to stand trial as an adult. A jury found Martinez guilty, and due to his age, an automatic life sentence was imposed. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On the morning of October 24, 2000, Jae Kyung Lee ("Lee") and Hyeon Ju Lee, recent emigres from Korea, opened their Dollar Plus store on Bandera Road. Through an interpreter, Lee testified that Martinez and Paul Vara, two customers he saw on an almost daily basis, came into the store twice that morning. Martinez and Vara returned a third time and asked Lee where his wife was. Lee responded that she was sleeping on a sofa near the cash register. After asking about several other items, Martinez and Vara asked Lee to show them a decorative sword displayed near the register. As Lee turned to get the sword, he saw a gun in Martinez's hand. Martinez fired a shot that hit Lee in the mouth and the impact of that shot caused Lee to fall to the floor. Lee then heard several things: Vara said, "shoot the wife;" two explosions sounded; and Hyeon Ju Lee cried out. Before Lee lost consciousness, he saw Martinez and Vara attempt to open the cash register. When Lee regained consciousness, the men were gone and he crawled out of the store to call for help.

Ben Esquivel, a police officer with the San Antonio Police Department, answered a call for a shooting at the Lees' store. When Esquivel and his partner arrived, they saw Lee outside the store, bleeding profusely and motioning the officers inside the store. Esquivel found Hyeon Ju Lee's

body behind the cash register. She had been shot twice as someone stood over her.

Jae Kyung Lee was taken to the hospital where his injuries were treated. Four days later, Detective Holguin interviewed Lee at the hospital and showed Lee a photo array. Lee identified Vara and Martinez in separate photo arrays. As soon as Lee saw Martinez's photograph, he said, "That was the boy who shot me."

Juan Mendoza, Vara's step-father, testified at trial. Mr. Mendoza stated that approximately two weeks before the shooting, Vara asked to borrow $200 to pay a debt Martinez owed to someone. Mr. Mendoza denied Vara's request. On the afternoon of the robbery, Mr. Mendoza became suspicious of the boys because they were watching the news, which was unusual. He noted that they seemed especially interested in news reports of the shooting at the Dollar Plus store.

Sylvia Mendoza, Vara's mother, testified that her husband roused her from a nap on the day of the shooting. Mr. Mendoza appeared concerned about the boys and asked her to talk to them. Mrs. Mendoza testified that the boys seemed scared and would not answer her questions. She was so alarmed by the boys' behavior that she asked them to leave. Two days later, Mrs. Mendoza spoke with Viola Serrano, one of Vara's girlfriends. The State was unable to produce Serrano as a witness at trial, but Mrs. Mendoza testified that Serrano informed her that Vara admitted committing the shooting at the Dollar Plus store. Serrano also informed Mrs. Mendoza that she hid the gun and that her mother had taken the shells from the gun to work and thrown them away there. After this conversation, Mrs. Mendoza called Detective Holguin and reported that she had information about her son's involvement in the shooting.

Serrano's mother testified that she called Detective Holguin and informed him that her daughter had the gun used in the shooting at the Dollar Plus store. The detective went to the Serrano home and retrieved a revolver. Ed Wallace, a firearms examiner for the Bexar County Criminal Investigation Laboratory, tested the gun recovered from the Serrano home against the bullet recovered from the scene and the one recovered from Hyeon Ju Lee's body. Wallace determined that the gun recovered from the Serrano home was the one used in the shooting at the Dollar Plus store.

Based on this evidence, a jury found Martinez guilty and, because of his minority, the trial court imposed a life sentence. On appeal, Martinez presents seven issues in which he complains that: (1) the trial court erred in allowing witnesses to testify even though they were not disclosed on the State's witness list; (2) his statement was not voluntary and should not have been admitted into evidence; (3) the trial court erroneously allowed into evidence the statement of his co-defendant as an adopted admission; (4) the trial court erred in denying his request for a jury charge on the voluntariness of his statement; (5) the trial court erred in failing to give a requested lesser included offense charge; (6) the court erred in failing to grant a mistrial based on juror coercion; and (7) the trial court denied his right to confrontation and cross-examination by permitting the State to reference the co-defendant's confession. For clarity, we will address these issues in a different order.

### UNDISCLOSED STATE WITNESSES

The trial court granted Martinez's request for the State to produce a list of prospective witnesses. The State subsequently called four witnesses whose

identities were not disclosed on its witness list. Before each witness testified, Martinez objected and moved for a mistrial on the grounds that the State's failure to disclose these witnesses surprised him and prevented him from adequately performing voir dire. Allowing a surprise witness to testify is not constitutional error. *See Merritt v. State*, 982 S.W.2d 634, 636 (Tex. App.-Houston [1st Dist.] 1998, pet ref'd). The applicable standard of review is abuse of discretion. *See Bridge v. State*, 726 S.W.2d 558, 566-67 (Tex.Crim.App.1986).

█ On appeal, the State claims Martinez waived these complaints by requesting a mistrial instead of a continuance. The State argues that when "a witness' name is not furnished a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of surprise is 'made harmless' by defendant's failure to object *or* move for a continuance." *Barnes v. State*, 876 S.W.2d 316, 328 (Tex.Crim.App.1994)(emphasis added). The State argues that Martinez's failure to object *and* move for a continuance waives his complaints about unfair surprise and inability to properly question the venire. Because Martinez timely objected on grounds of surprise and moved for a mistrial, the complaint is properly preserved. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App.1996) (error preserved when complaint pursued to an adverse ruling). However, for the reasons detailed below, Martinez can not successfully argue that he was unfairly surprised by the State's action of calling these witnesses.

█ In determining whether the trial court abused its discretion in permitting an undisclosed witness to testify, this court must answer two questions: (1) did the prosecutor act in bad faith by failing to disclose the names of the witnesses ahead of time; and (2) could the defen-

dant reasonably anticipate that the witnesses would testify, although their names were not included on the witness list. *See Bridge*, 726 S.W.2d at 566-67. Reviewing courts have focused on three areas of inquiry in deciding whether the State acted in bad faith: (1) whether the defense shows that the State intended to deceive; (2) whether the State's notice left the defense adequate time to prepare; and (3) whether the State freely provided the defense with information (e.g., by maintaining an open files policy, by providing updated witness lists, or by promptly notifying the defense of new witnesses). *Hardin v. State*, 20 S.W.3d 84, 88 (Tex.App.-Texarkana 2000, pet. ref'd). In determining whether the defense could have anticipated the State's witness, reviewing courts also have examined three areas of inquiry: (1) the degree of surprise to the defendant; (2) the degree of disadvantage inherent in that surprise (e.g., the defendant was aware of what the witness would say, or the witness testified about cumulative or uncontested issues); (3) the degree to which the trial court was able to remedy that surprise (e.g., by granting the defense a recess, postponement, or continuance, or by ordering the State to provide the witness' criminal history). *Id.* If this court finds that Martinez reasonably anticipated that these witnesses would testify, then we will reject his argument that the State's failure to disclose the identities of these witnesses prevented him from adequately performing voir dire. *See Salinas v. State*, 625 S.W.2d 397, 402 (Tex. App.-San Antonio 1981, no pet.).

To prove the absence of bad faith, the prosecutor apologized to the trial court and explained her failure to provide these names. She stated that this was the first time she compiled a witness list on the computer, and in formatting, some names

were inadvertently excluded. She also admitted that, although the list was lengthy, she should have checked it more carefully. Finally, she reasoned that the witness' names were disclosed on the subpoena list, preventing any real surprise to the defense. This explanation establishes the absence of the State's intent to deceive. Additionally, defense counsel requested a continuance before cross-examining only one of these witnesses, and the trial court granted that request. The record shows that Martinez was prepared to vigorously cross-examine each of these witnesses. These facts support the conclusion that defense counsel was adequately prepared. Finally, the prosecutor argued that Martinez was given extraordinary access to the State's open file, which contained written reports and references to these potential witnesses. The record also reflects that there was no significant delay between the time the State realized its mistake and the time it informed defense counsel of the identity of the undisclosed witnesses. These facts support a finding that the State freely provided the defense with information. We therefore conclude that the State did not act in bad faith by calling any of these witnesses.

Turning to the second prong, the court must decide whether the defendant could reasonably anticipate that the individual witness would testify although their name was not disclosed.

### Jae Kyung Lee

Lee was the only witness who could provide direct evidence about the events that morning. He identified Martinez in a photo array, and defense counsel cross-examined Lee at a prior hearing on a motion to suppress that identification. Defense counsel was aware of the content of Lee's testimony and did not request a recess or a continuance to prepare for cross-examination. Although Martinez claimed to be surprised, the record shows that defense counsel should have reasonably anticipated that Lee would testify. The trial court did not err in admitting Lee's testimony.

### Juan Carlos Campacos

Campacos is an evidence detective with the San Antonio Police Department who collected physical evidence and took pictures of the scene. He provided chain of custody testimony and authenticated the photos he took that day. His name appears on various reports contained in the State's open file. If there was any surprise in the State calling this witness, it was slight. Martinez did not challenge the chain of custody, and the State claims the photographic evidence could have been authenticated by any witness present that day. This shows the lack of disadvantage inherent in calling Campacos. Finally, defense counsel did not accept the court's offer to recess to prepare for cross-examination. These factors show that the defense reasonably anticipated that Campacos would testify, so the trial court did not abuse its discretion in permitting Campacos to testify.

### Duane Gonyon

Gonyon, a detective investigator for the San Antonio Police Department, responded to the call from the Lees' store and videotaped the scene. With Gonyon on the stand, the State played the video and asked Gonyon to provide commentary. Gonyon also testified about the State's unsuccessful search for fingerprints. Defense counsel objected when the State called this witness, but the State informed the court that a video made by Gonyon was in its file and had been viewed by defense counsel. This evidence shows that Martinez was not surprised when the State

called Gonyon, and that Martinez was not placed at a disadvantage by not knowing what Gonyon's testimony would be. Finally, defense counsel did not request a recess, postponement, or continuance to prepare to cross-examine Gonyon. Because the record shows Martinez reasonably anticipated that Gonyon would be called, the trial court did not abuse its discretion in permitting him to testify.

## Ed Wallace

Wallace works at the Bexar County Criminal Investigation Laboratory as a firearms examiner. He testified that a bullet recovered from Hyeon Ju Lee's body and one found at the scene matched the gun recovered from the Serrano home. Initially, the State designated another firearms examiner, Ed Love, as its witness from the Bexar County Criminal Investigation Laboratory. Before voir dire, however, the State informed defense counsel that Wallace, not Love, would testify about a report the men authored jointly. The trial court overruled Martinez's objection because Wallace's name was previously disclosed and his written report was contained in the State's open file. This evidence shows that Martinez was not surprised by the State's action of calling Wallace. Furthermore, the State claimed that Wallace's testimony was identical to testimony the State expected to receive from Love. This evidence supports a conclusion that there was no inherent disadvantage in the State calling Wallace. Finally, the trial court called an early lunch recess and gave defense counsel the time he requested to review the firearms examination report. Therefore, the trial court did not err in permitting Wallace to testify.

Because the prosecutor did not act in bad faith and the defense could reasonably anticipate that each of these witnesses would testify, we overrule Martinez's first issue.

### ADMISSIBILITY OF MARTINEZ'S STATEMENT

█ A trial court's suppression rulings are subject to a bifurcated standard of review. *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000). We will afford almost total deference to the factual findings entered by the trial court. *See id.* However, we review the trial court's application of the law of search and seizure *de novo. See id.* This court will reverse the trial court's judgment if we find, based on the totality of the circumstances, that Martinez's statement was illegally obtained, and that admission of the statement harmed him. *See Baptist Vie Le v. State,* 993 S.W.2d 650, 656 (Tex.Crim.App.1999).

In his second issue, Martinez argues that the trial court erred when it denied his motion to suppress the written statement he gave to Detective Holguin. He claims that the written statement was not voluntarily given and its admission violates section 51.095 of the Texas Family Code. *See* TEX. FAM.CODE ANN. § 51.095 (Vernon 2002) because he was not taken before a magistrate and never received a warning that he could remain silent, have an attorney present, receive appointed counsel, or terminate the interview at any time. He also argues that admission of his statement violates articles 38.22 and 38.23 of the Texas Code of Criminal Procedure as well as article 1, sections 10 and 19 of the Texas Constitution, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The State responds that articles 38.22 and 38.23 of the Texas Code of Criminal Procedure only apply to adults accused of a crime, not to juveniles like Martinez. The State also claims that Martinez's right to counsel under the Texas and United States Constitutions had not yet attached.

■ Section 51.095 of the Texas Family Code sets forth admonishments which must be given to a juvenile before the juvenile makes any statement. *See id.* § 51.095(a). If the juvenile is not given the statutorily required admonishments, then the juvenile's statement is inadmissible. *See id.* However, a statement which is not the product of custodial interrogation is not required to be suppressed, even when the juvenile does not receive the statutory admonishments. *Melendez v. State*, 873 S.W.2d 723, 725 (Tex.App.-San Antonio 1994, no pet.).

■ Custodial interrogation is questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of their freedom in any significant way. *Cannon v. State*, 691 S.W.2d 664, 671 (Tex.Crim.App.1985). A child is in custody if, under the objective circumstances, a reasonable child of the same age would believe his freedom of movement was restrained to the degree associated with a formal arrest. *See Jeffley v. State*, 38 S.W.3d 847, 855 (Tex.App.-Houston [14th Dist.] 2001, pet ref'd); *In re E.P.C.*, No. 04–02–00086–CV, 2003 WL 1611415, at *2 (Tex.App.-San Antonio March 31, 2003, pet. denied)(mem. op.). We apply a two-step analysis to determine whether an individual is in custody. First, the court examines all the circumstances surrounding the interrogation to determine whether there was a formal arrest or restraint of freedom of movement to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). This initial determination focuses on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the individual being questioned. *Id.* at 323, 114 S.Ct. 1526. Second, in light of those circumstances, the court considers whether

a reasonable person would have felt free to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Courts traditionally consider four factors in making this determination: (1) whether probable cause to arrest existed at the time of questioning; (2) the subjective intent of the police; (3) the focus of the investigation; and (4) the subjective belief of the defendant. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996). However, the subjective intent of both the police and the defendant is irrelevant except to the extent that the intent may be manifested in the words or actions of law enforcement officials. *Id.* The custody determination is based entirely upon objective circumstances. *Id.* Additionally, being the focus of a criminal investigation does not amount to being in custody. *See Meek v. State*, 790 S.W.2d 618, 620 (Tex.Crim. App.1990). When the circumstances show that the individual acts upon the invitation or request of the police and there are no threats, express or implied, that he will be forcibly taken, then that person is not in custody at that time. *Dancy v. State*, 728 S.W.2d 772, 778–79 (Tex.Crim.App.1987). It is also important to note that stationhouse questioning does not, in and of itself, constitute custody. *Dowthitt*, 931 S.W.2d at 255.

Martinez cites *In re S.A.R.*, 931 S.W.2d 585 (Tex.App.-San Antonio 1996, writ denied), as support for the argument that he was in custody at the time he confessed his involvement in the crime. In *S.A.R.*, a juvenile was taken to the police station by four officers in a marked patrol car. *Id.* at 587. Once at the station, the juvenile was photographed, fingerprinted, informed that she was a suspect, and questioned by three officers in a small room. *Id.* The officers focused their investigation on S.A.R. and told her that she was a suspect for attempted capital murder and capital mur-

der. These facts, combined with the fact that the investigation focused on the juvenile, led this court to find that a reasonable person would have believed that their freedom of movement had been significantly curtailed. *Id.*[1]

The circumstances surrounding Martinez's statement are distinguishable from those in *S.A.R.* Martinez voluntarily agreed to accompany plain clothes officers to the police station. The officers informed Martinez that he could drive himself or be transported to the station. Rosalinda Cuevas, Martinez's mother, agreed that her son could give a statement, and she accompanied her son to the police station in an unmarked car. Detective Saidler advised Martinez that no matter what he said, he would not be arrested that day. Both Martinez and Cuevas testified that they were advised that they would be brought home after the interview. Martinez was specifically advised that he was not being arrested before he left home, and he was never handcuffed. Martinez was taken to an interview room with Detective Holguin and Cuevas was taken to another room with Detective Saidler. Detective Holguin advised Martinez that Vara had provided a statement. Martinez then agreed to tell the detective what he knew. Martinez cooperated with the detective and, after giving his statement, said that he felt relieved. Martinez read over his statement and made handwritten corrections. He complied with Detective Holguin's request to read the first paragraph out loud to prove that he could read. After signing the statement, he left the interview room, joined his mother, and explained to her what he had done. Curiously, Detective Owen overheard Cuevas tell her son that he would be grounded and could not go out anywhere all weekend. Martinez agreed to let the detectives take a photograph of him, and then he and Cuevas were taken home. A warrant issued and Martinez was arrested the next day.

The parties agree that Martinez was not formally arrested or handcuffed at the time he gave his statement and that he voluntarily went to the police station. The fact that Martinez acted upon the invitation of the police and was never threatened to be forcibly taken indicates that his movement was not restrained to the degree associated with a formal arrest. *See Dancy*, 728 S.W.2d at 778–79. Martinez testified that once he arrived at the police station, he was questioned in a small interview room. He stated that he was surrounded by uniformed and plain clothes officers, all of whom were armed. However, all of the detectives present that day testified at the hearing on the motion to suppress, and Detective Holguin was the only officer to testify that his weapon may have been visible. In fact, Detective Owen testified that she and the other plain clothes detectives had gone to great lengths to conceal their weapons, and that none of the plain clothes officers' weapons were visible. It is also important to note that Martinez had been arrested before and had been adjudicated delinquent after committing vandalism. He testified that he was familiar with the arrest process and had previously been detained, handcuffed, arrested, and processed through the juvenile justice system where he was provided with appointed counsel. This evidence indicates that Martinez's freedom of movement was curtailed less than if he had been formally arrested.

---

1. The *S.A.R.* opinion was handed down before this court adopted the "reasonable child of the same age" definition of juvenile custody.

■ Turning to the second prong, we decide whether a reasonable person would have felt free to terminate the interrogation and leave. In answering this question, we look to the objective factors of whether the police officers had probable cause to arrest Martinez at the time and whether he was the focus of the investigation. The State concedes that the police may have had probable cause to arrest Martinez because both Vara and Nicole Russo, one of Vara's girlfriends, implicated Martinez in the robbery. However, at the time, the officers had information that Paul Vara pulled the trigger. Detective Saidler testified that when the officers asked Martinez to come to the police station, they were acting on information from Russo that Vara was the shooter. Additionally, Lee did not identify Martinez as the one who shot him until the day after the police questioned Martinez. Detective Holguin testified that the investigation did not focus on Martinez and continued even after Martinez gave his statement. This evidence shows that although the police suspected Martinez's involvement in the crime, he was not the only suspect at the time the police questioned him.[2]

The remaining factors require us to look to the outward manifestations of the subjective beliefs of Martinez and the officers. Cuevas testified that Detective Saidler told Martinez that no matter what he said, he would not be arrested that day, and he would be going home after providing a statement. Detective Holguin testified that he told Martinez that he was not under arrest. These statements are objective proof that the police officers lacked the subjective intent to place Martinez in custody. However, Martinez testified that he was never told he was free to go. He stated that he felt scared and did not feel free to leave. However, he did not express these fears until the hearing on the motion to suppress. Because the subjective intent of the defendant is irrelevant unless it is manifested in words or actions, we can not consider his testimony that he felt scared or free to leave. In evaluating his subjective beliefs, we can consider what Martinez did not do. He never asked for a break, never asked to go home, and never asked for his mother or an attorney. This is objective evidence that Martinez was not in custody at the time he gave his statement.

The State also elicited testimony from Martinez that he was independent and had chosen to live away from his mother and step-father. Martinez had been employed as a construction worker where he worked full days. He also stated that he had experience with budgeting money and knew how to navigate the bus system. Although the court received evidence that Martinez had the reading, spelling, and math abilities of a second or third-grader, the evidence showed Martinez to be more worldly than the average 15 year-old. Martinez did not hesitate before telling his

2. As an aside, Martinez complains that on cross-examination, Detective Holguin admitted that he failed to tell Martinez that he was being investigated about a murder. Martinez and Cuevas testified that if they had been told he would be questioned about a murder, they would not have agreed to go to the police station without a lawyer. However, on redirect, Holguin stated that he did tell Martinez that he was being investigated in connection with a robbery and murder. The trial court is the exclusive judge of the credibility of witnesses as well as the weight to be afforded their testimony. *Barton v. State*, 605 S.W.2d 605, 607 (Tex.Crim.App.1980). Therefore, Martinez's complaint that he was not informed of the severity of the crime being investigated does not alter this court's analysis. *See Creager v. State*, 952 S.W.2d 852, 856 (Tex.Crim.App.1997) ("[t]rickery or deception does not make a statement involuntary unless the method was calculated to produce an untruthful confession or was offensive to due process.").

story to the detectives. His behavior did not indicate that he was afraid or felt intimidated. We believe a reasonable child of the same age would have had the ability to terminate the interrogation and leave. The record supports a finding that Martinez was not in custody when he gave his statement.

■■■■ Even in the absence of custody, due process may be violated by admitting confessions that are not voluntarily given. *Wolfe v. State,* 917 S.W.2d 270, 282 (Tex.Crim.App.1996). A statement is not voluntary if there was "official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex.Crim.App.1995). If raised by the defendant, the prosecution bears the burden of proving by a preponderance of the evidence that the statement was given voluntarily. *Id.* The trial court is the sole judge of the weight and credibility of the evidence, and the trial court's finding on voluntariness may not be disturbed on appeal absent an abuse of discretion. *Id.*

■■■■ Martinez argues that evidence of his low education level and poor performance on intelligence tests combined with his age prove that he did not understand the significance of waiving his rights. However, "[t]he mere fact that appellant is uneducated and illiterate does not mean that he does not understand the nature of the rights he is waiving and cannot voluntarily give a confession." *Peacock v. State,* 819 S.W.2d 233, 235 (Tex.App.-Austin 1991, no pet.). Likewise, the fact of a juvenile's minority does not require that any confession be found involuntary. *See, e.g., In re V.M.D.,* 974 S.W.2d 332, 346 (Tex.App.-San Antonio 1998, no pet.) (holding 12–year old's confession to capital murder voluntary even absent the admonishments provided by the Family Code).

Evidence of Martinez's worldly experiences shows that he was more sophisticated than an average 15 year-old; in fact, the record demonstrates that Martinez's behavior was comparable to that of an adult. Additionally, the fact that he had been previously arrested, handcuffed, and provided with a lawyer militates toward a finding that he understood the value of his rights and the significance of waiving those rights. In the presence of his mother and also with her consent, Martinez voluntarily accompanied the officers to the station for the purpose of giving a statement. There is no allegation that any of the detectives threatened or otherwise coerced Martinez into making his confession. Likewise, there is no allegation that any of the officers suggested how the crime might have occurred or promised leniency in exchange for the confession.

Detective Owen testified that 90 minutes to two hours passed between the time Martinez arrived at the police station and the time he was returned home. In the interim, Martinez told his story to Detective Holguin, the detective typed the four page confession, Martinez read the first paragraph out loud, made corrections to the statement, and told his mother what he had done. Martinez was eager to tell his story and Detective Holguin testified that Martinez appeared relieved after signing the statement. Even if Martinez had created a fact issue on the voluntariness of his statement, after viewing all of the evidence in the light most favorable to the trial court's ruling, the State controverted that evidence and proved that the statement was voluntary. These facts support the trial court's conclusion that Martinez voluntarily gave his written statement. Because this finding is supported by the record, we overrule Martinez's second issue.

## Denied Request for a Voluntariness Charge

In his fourth issue, Martinez argues that the trial court erred in failing to instruct the jury to disregard Martinez's confession if it was unable to find that the confession was voluntarily given. However, because Martinez was not in custody when he made his statement, the question of whether the jury should have received an instruction on the voluntariness of that statement is moot. *See Land v. State*, 943 S.W.2d 144, 149 (Tex.App.-Houston [1st Dist.] 1997, no pet.)(finding that the requirements of article 38.22 regarding instructing the jury on the voluntariness of a statement do not apply when the statement did not stem from custodial interrogation); *Garza v. State*, 915 S.W.2d 204, 210 (Tex.App.-Corpus Christi 1996, pet. ref'd). We therefore overrule Martinez's third issue.

### Adoptive Admission

Martinez complains that the State failed to provide the proper notice of its intent to use adoptive admission evidence as required by TEX.R. EVID. 404(b). However, defense counsel did not register this objection when this evidence was introduced at trial. Because this question is not a fundamental error, it is waived by defense counsel's failure to object. *See Montgomery v. State*, 810 S.W.2d 372, 387 (Tex.Crim.App.1990). To the extent that Martinez alleges error in the admission of evidence not properly noticed under Rule 404(b), this complaint is overruled.

The trial court's decision to admit evidence is reviewed under an abuse of discretion standard. *See id.* at 391. Therefore, this court will not reverse unless the trial court's decision to admit the evidence complained of was outside the zone of reasonable disagreement. *See Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim.App.1996).

On appeal, Martinez claims that the trial court abused its discretion in permitting Mr. Mendoza to testify that Vara had a handgun in his possession two weeks before the offense. Martinez also argues that the State failed to connect Vara's gun to Martinez or the crime, and so this evidence was irrelevant. However, evidence connecting Vara's gun to Martinez and the shooting at the Dollar Plus store was properly admitted through Martinez's statement, where he admitted the following:

Paul has a gun, it's a .38 caliber. It's like black with some brown handles. Paul loaded the gun with bullets. Paul's had this gun for a while. We've shot the gun in the street. I've shot the gun about three or four times. I got Paul's gun and I put it in my pants....

I pulled the gun from inside my pants. When the owner turned around with the sword I had the gun pointed at him. I was going to tell the owner to give me the money but I saw him taking the sword out. I got scared and I fired the gun at him. He flew back. I could see him bleeding from his mouth. The blood was gushing out. The owner hit the wall and fell down, like he was sitting down. I took the step up and shot the woman two times....

Martinez admitted that he took the gun from Vara's home, used it in the shooting at the Dollar Plus store, and then gave it to Serrano. Subsequent testing revealed that the weapon found in the Serrano home was the murder weapon. This is sufficient evidence to link Martinez to the gun Vara admitted to Mr. Mendoza that he possessed. Where substantially the same evidence complained of on appeal is received without objection, any error in admission of the testimony is waived. *See Penry v. State*, 691 S.W.2d 636, 655 (Tex.

Crim.App.1985). Because Martinez's confession established the link between Martinez and Vara's gun, any error in admitting Mr. Mendoza's testimony that Vara had a gun without linking it to Martinez is harmless. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex.Crim.App.1999).

■ Martinez also complains that the trial court abused its discretion in admitting statements Vara made to Mr. Mendoza that Martinez owed a debt. Mr. Mendoza testified when he and Vara had the conversation about the debt, Martinez was in the room and did not deny owing the debt. On appeal, he argues that the statement about owing a debt is irrelevant and is not a tacit admission of motive to commit the crime. The trial court held a hearing outside the presence of the jury where Mr. Mendoza testified that Vara informed him that Martinez's debt was owed for drugs. However, the trial court suppressed any testimony relating Martinez's debt to drugs and this evidence was never presented to the jury. A statement is not hearsay and may be offered against a party if it is "a statement of which the party has manifested an adoption or belief in its truth." TEX.R. EVID. 801(e)(2)(B); *Crestfield v. State*, 471 S.W.2d 50, 54 (Tex. Crim.App.1971) (adoptive admission occurs when a statement is made in the defendant's presence, defendant understands statement, statement calls for a reply, and defendant remains silent, although not under arrest). Here, the State elicited testimony from Mr. Mendoza that Vara made a statement in Martinez's presence that Martinez owed a debt and "if he did not pay it, he would be in trouble." Mr. Mendoza testified that he thought Martinez heard the conversation because he was in the same room. However, Martinez did not reply, even though this is the type of statement which typically calls for a reply. *See Tucker v. State*, 771 S.W.2d 523, 535

(Tex.Crim.App.1988). Evidence that Martinez owed a debt was probative of his motive to rob the Dollar Plus store. The statement that Martinez owed a debt becomes an adoptive admission by Martinez, and as such, was properly admitted for the purpose of suggesting Martinez's motive. We therefore overrule Martinez's fourth issue.

## CO-DEFENDANT'S CONFESSION

■ Martinez claims that the trial court erroneously admitted testimony in violation of his Sixth Amendment Confrontation Clause right. Martinez argues that the trial court abused its discretion in permitting Detective Holguin to testify that he took Vara's statement which led the investigation to Martinez. According to Martinez's brief, Vara invoked his Fifth Amendment rights and was unavailable to testify at Martinez's trial because his conviction was being appealed. However, Martinez complains about the following exchange:

State: Now, did you have an opportunity to talk to Paulo Vara on that day?

A: Yes, I did.

State: And what happened when you spoke with Paulo Vara?

A: He gave a confession.

State: All right. Now, in his confession did he help you develop an additional suspect?

A: Yes.

State: And who was that?

A: That was John Martinez.

State: Now, you had already learned some information about John Martinez—

Defense: Excuse me, I have an objection that needs to be taken out of the presence of the jury.

On appeal, the State claims that this error is not preserved. We agree, but for

different reasons than those set forth in the State's brief. The State claims that this error is not preserved because Martinez initially elicited this testimony from Detective Holguin in the hearing on the motion to suppress Martinez's confession. Because that evidence was elicited out of the presence of the jury, it does not waive this error. However, defense counsel's objection to this testimony was untimely. *See* Tex.R.App. P. 33.1(a)(1). Before defense counsel objected, Detective Holguin answered the State's question, testified that Vara's confession helped develop Martinez as a suspect, and the State moved on to another question. For that reason, we overrule Martinez's complaints about admission of his co-defendant's confession.

## Lesser Included Offense Charge

▉▉▉▉ Martinez argues the trial court erred in refusing to submit charges of murder, felony murder, and aggravated robbery as lesser included offenses of capital murder. Because defense counsel objected at trial, reversal is required if the error is calculated to injure the rights of the defendant. *See Almanza v. State,* 724 S.W.2d 805, 806 (Tex.Crim.App.1986). Error which has been properly preserved by objection will call for reversal as long as the error is not harmless. *Id.*

▉▉▉▉ Whether a charge on a lesser included offense is required is determined by a two-pronged test. *Schweinle v. State,* 915 S.W.2d 17, 18 (Tex.Crim.App.1996). First, we must determine whether the offense constitutes a lesser included offense. *Id.* The Texas Code of Criminal Procedure provides that an offense is a lesser included offense if, *inter alia:* "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." Tex.Code Crim. Proc. Ann. art. 37.09 (Vernon 1981). Second, the lesser included offense must be

raised by the evidence at trial. *Schweinle,* 915 S.W.2d at 18. Anything more than a scintilla of evidence is sufficient to entitle a defendant to a charge on a lesser included offense. *See Bignall v. State,* 887 S.W.2d 21, 23 (Tex.Crim.App.1994). However, evidence must exist that would permit a rational jury to find that the defendant is guilty *only* of the lesser included offense. *See id.* (emphasis added).

### Murder and Felony Murder

If there was evidence in this case that Martinez intentionally or knowingly caused Hyeon Ju Lee's death but lacked the intent to commit a robbery, then he would have been entitled to a charge on the lesser included offense of murder. *Compare* Tex. Pen.Code Ann. § 19.02 (Vernon 2003), *with* Tex. Pen.Code Ann. § 19.03 (Vernon 2003). Likewise, if Martinez killed Hyeon Ju Lee in the course of committing or attempting to commit a robbery, but lacked the requisite intent to kill, then he would have been entitled to a charge on the lesser included offense of felony murder. *See Fuentes v. State,* 991 S.W.2d 267, 272–73 (Tex.Crim.App.1999).

The day before Martinez was arrested, he confessed his involvement in the crime to Detective Holguin. This statement, which was read to the jury, showed that Vara informed Martinez of his plan to rob the Lees' store. Martinez agreed to go with Vara, and before they left Vara's home, Martinez picked up Vara's gun and hid it in his pants. Martinez and Vara walked through alleys to get to the store, apparently to avoid being seen by nearby store owners. Once Martinez and Vara reached the store, they determined Hyeon Ju Lee's location and began to examine the globes on the store's ceiling which they thought might contain video cameras. Before initiating the robbery, Martinez and Vara looked closely and determined that

the globes did not contain any video cameras. When Vara asked Lee to take a sword off the wall behind the register, Martinez told Vara to "expect it." According to Martinez's confession, this statement was intended to inform Vara that it was time to rob the store. Martinez also stated that he and Vara had previously talked about committing the robbery.

Martinez argues, essentially, that he did not share in Vara's intent to rob the store. His brief claims that he was "functioning on a lower level of mental capacity and was quite callow." At trial, Martinez presented evidence that, based on a series of intelligence tests, his reading, spelling, and math abilities were at a second or third grade level. However, the evidence that Martinez owed a debt established his motive to rob the store. This combined with Lee's testimony that Martinez and Vara attempted to open the cash register after the shooting supports a finding that both men intended to rob the store. Furthermore, the expert who analyzed the test results testified on cross-examination that Martinez appeared to intentionally underperform on the intelligence tests. Martinez's theory that he lacked the intent to commit the robbery does not present a valid rational alternative to the charged offense. *See Bignall,* 887 S.W.2d at 23. Therefore, Martinez's claim that he was entitled to an instruction on the lesser included offense of murder must fail.

■ Martinez's argument that he was entitled to a felony murder instruction because he lacked the intent to commit murder is also without merit. Lee testified that after Martinez shot him, he heard Vara instruct Martinez to "shoot the wife." Martinez then fired the two shots that killed Hyeon Ju Lee. This is clear evidence of Martinez's intent to cause the death or serious bodily injury to Hyeon Je Lee. The evidence in this case does not show that if

Martinez was guilty of anything, he was guilty of only an unintentional killing, so Martinez was not entitled to a jury charge on felony murder.

### Aggravated Robbery

■ A person commits aggravated robbery if, in the course of committing a theft, and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another, and uses or exhibits a deadly weapon. *See* TEX. PEN.CODE ANN. § 29.03 (Vernon 2003). Because the proof necessary for capital murder committed in the course of a robbery contains the elements necessary for aggravated robbery, aggravated robbery may be a lesser included offense of capital murder. *See Quintanilla v. State,* 40 S.W.3d 576, 579 (Tex.App.-San Antonio 2001, pet. ref'd). However, the evidence in this case does not show that if Martinez was guilty, he was guilty only of aggravated robbery.

The State presented Lee's testimony that Vara told Martinez to "shoot the wife" and Martinez then fired the shots that killed Hyeon Ju Lee. This is evidence of an intentional killing. The evidence in this case did not establish aggravated robbery as a "valid rational alternative to the charged offense," nor did it permit the jury to find that Martinez had committed only aggravated robbery. *See Jackson v. State,* 992 S.W.2d 469, 474–75 (Tex.Crim. App.1999) (holding "[a] murder defendant is not entitled to an instruction on the lesser included offense of aggravated assault when the evidence showed him, at least, to be guilty of homicide."). Because evidence did not exist that would permit a rational jury to find that the defendant was guilty of *only* murder, felony murder, or aggravated robbery, the trial court did not err in denying Martinez's requested charge on lesser included offenses. We

therefore overrule Martinez's penultimate issue.

### ALLEN CHARGE

The denial of a motion for mistrial is reviewed under an abuse of discretion standard. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex.Crim.App.1999). Likewise, we review questions about the length of time the jury deliberates for an abuse of discretion. *DeLuna v. State*, 711 S.W.2d 44, 48 (Tex.Crim.App.1986). The decision to give a supplemental charge is also subject to review for an abuse of discretion. *See Howard v. State*, 941 S.W.2d 102, 123 (Tex.Crim.App.1996).

Martinez's final issue complains that the trial court erred in overruling his motion for a mistrial after the jury sent out two notes indicating that it was deadlocked. The jury began its deliberations on February 6, 2001 at 11:50 a.m., broke for lunch, and sent the court a note that it was deadlocked before its dinner break at 6:00 p.m. Without objection, the court instructed the jury to continue deliberating, which it did until around 9:00 p.m. The jury resumed deliberations the next day at 9:00 a.m., requested that lunch be brought in, and sent out another note around 4:00 p.m. indicating that it was hopelessly deadlocked with one juror voting not guilty. The juror voting not guilty also sent out a note which reads as follows:

> Your Honor, I appeal to you out of a sense of frustration and deadlock. And out of a sense of wanting to do my duty to not cave-in to the other jurors and a sense of guilt of causing undue hardship to my fellow jurors. Key to all of this is the Charge of the Court that J.M. intentionally caused the death. The description or definition of intentionally under 2, states in part, "when it is his conscious objective or desire to cause the result." I do not see or can find in what

evidence we have that the State proved or even cited facts to substantiate intentionally. We all agree on knowingly aware that his conduct. But I, and I alone, cannot find intent to kill. I have asked my co-jurors to show me where, but from perspective, they have merely repeated the items we agree upon under aware. My colleagues, from my perspective, have come to the point of "probably" "because he" and attacks on my motives and integrity. In a sense I cannot blame them, and I do feel responsible for their hardship experienced or being experienced. I need help. I need help with explanation, elaboration of what the element "intentionally caused" equal intent with respect to the issue of his conduct when it is his conscious objective or desire to cause the result. Perhaps you, or a member of the Court, could meet me in chambers to help me. Otherwise, I do not feel our impass will end. Thank you. Joseph C. Valenzuela, Jr. [sic throughout]

The court then submitted the following supplemental charge to the jury:

> Members of the Jury. Your Presiding Juror has advised the Court that you have not been able to reach a unanimous decision. In connection with such communication, I advise the jury as follows:
>
> Any verdict in this case must be unanimous. If this jury, after a reasonable length of time, finds itself unable to arrive at a unanimous verdict, it will be necessary for the Court to declare a mistrial and discharge the jury.
>
> The indictment will still be pending, and it is reasonable to assume that the case will be tried again before another jury at some future time. Any future jury will be impaneled and will likely hear the same evidence which has been presented to this jury. The questions to be determined by that jury will likely be the

same questions confronting you. And there is no reason to hope the next jury will find those questions any easier to decide than you have found them.

With this additional instruction, you are instructed to continue the deliberations in an effort to arrive at a verdict, which is acceptable to all members of the jury. Remember, at all times, that no juror is expected to yield a conscientious conviction he or she may have as to the weight or the affect [sic] of the evidence. But remember also that after full deliberation and consideration of the evidence in this case, it is your duty to agree upon a verdict, if you can do so, without surrendering your conscientious conviction.

If the jury wishes to communicate further with the Court they shall notify the bailiff. Any communications relative to the case must be written, prepared by the presiding juror, and shall be submitted to the Court through the bailiff. Carmen Kelsey, Presiding Judge.

At 4:30 p.m., the jury retired and continued deliberating. The jury took a dinner break of more than one hour and returned its guilty verdict at 8:40 p.m. Excluding lunch and dinner breaks, the jury deliberated for around 16 hours. According to Martinez, the court's *Allen* charge had the effect of coercing a verdict. *See Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

Further complicating matters, Juror Valenzuela was contacted after trial and signed an affidavit which reads as follows:

I was a juror in the case of the State of Texas vs. John G. Martinez. The day after the verdict was rendered I received a telephone call from a Bexar County District Attorney's Investigator named Rick Sauceda. Mr. Sauceda asked directions to my work and said he had an affidavit he wanted me to sign. Mr. Sauceda came to my place of employment at Lackland Air Force Base, and I signed the affidavit. A short time later I received a letter from the prosecutors in this case thanking me for my service as a juror.

It has always been my feeling that the prosecution did not prove capital murder in this case. The jury charge gave the definition of capital murder and murder, but there was no provision for a finding of murder, or robbery. I believe that if other sentencing options were available the jury would have chose one of them. As a juror I could not just let John Martinez go so I finally voted for the only option that was given to me, and that was to vote for the capital murder conviction.

■■■■ The use of a supplemental charge in this context has long been sanctioned by both the Texas Court of Criminal Appeals and the United States Supreme Court. *Howard*, 941 S.W.2d at 123. An *Allen* charge is unduly coercive and therefore improper if it pressures jurors into reaching a particular verdict or improperly conveys the court's opinion of the case. *See Arrevalo v. State*, 489 S.W.2d 569, 571 (Tex.Crim.App.1973). The primary inquiry to determine the propriety of an *Allen* charge is its coercive effect upon juror deliberations, "in its context and under all circumstances." *Id.* To answer that question, the court examines the nature of the case, the amount of evidence considered by the jury, and the time of deliberation. *See Lindsey v. State*, 393 S.W.2d 906, 908 (Tex.Crim.App.1965).

We must examine the nature of the case in determining whether the trial court abused its discretion in giving this charge instead of declaring a mistrial. *See id.* First, the language used in this charge is similar to language found not to be coercive in other cases. The charge itself did not directly address the minority juror and

did not shade the instruction with coercive nuance. *See Howard,* 941 S.W.2d at 124. Rather, the trial court simply directed all jurors "to continue deliberations in an effort to arrive at a verdict which is acceptable to all members of the jury." The court's charge reminded the jurors that "no juror is expected to yield a conscientious conviction he or she may have as to the weight or the affect of the evidence"... and that "it is your duty to agree upon a verdict, if you can do so, without surrendering your conscientious conviction." Martinez does not suggest that the language of this charge conveyed the court's opinion of the case.

Second, the complexity of this case and factors of judicial economy weigh in favor of the trial court's instruction to the jury to continue deliberating. This was a capital murder case made even more difficult by the fact of Martinez's minority. After three days of voir dire, the presentation of testimony spanned seven days, and 21 witnesses testified. When the jury reported that it was unable to reach a unanimous verdict, the trial court gave the instruction provided by the defense.

Martinez requests a change in the law applicable to these types of supplemental charges. He states that this case requires a departure from established law because Juror Valenzuela directly expressed "feelings that his conscience was being questioned along with his integrity." However, the process of questioning one's ideological beliefs and predispositions is central to the success of the jury system. "The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen,* 164 U.S. at 501–02, 17 S.Ct. 154. It certainly cannot be the law that each juror should not listen with deference to the arguments and with distrust of its own judgment, if he finds a large majority of the jury taking a different view of the case than what he does himself. *Id.* It cannot be that each juror should go into the jury room with a blind determination that his verdict shall represent his opinion of the case at the moment; or that he should close his ears to the arguments of others who are equally intelligent and honest as himself. *See id.*

Based on the trial court's broad discretion in these matters, the emotional nature of the testimony presented in this case, and the gravity of the crime, the trial court properly ordered the jury to continue deliberating and reach a verdict if it was possible to do so without sacrificing any one juror's conscientious conviction. *See, e.g., Howard,* 941 S.W.2d at 123 (trial court properly denied motion for mistrial in capital murder case where jury deliberated on punishment for 49 hours including breaks and sent three notes that it was deadlocked); *Stanton v. State,* 535 S.W.2d 182, (Tex.Crim.App.1976) (no error in trial court's ordering jury to continue deliberating when juror who signed guilty verdict raised her hand and stated that she signed the verdict against her will); *Arrevalo,* 489 S.W.2d at 571–72 (no error in court's failure to grant a mistrial after juror deliberated eight hours and sent out note that four jurors including foreperson and three other jurors created a deadlocked minority on charge of sale of narcotics); *Potter v. State,* 481 S.W.2d 101, 106 (Tex.Crim.App.1972)(*Allen* charge proper in felony theft case where jury deliberated for four hours before giving of charge and returned verdict 40 minutes after charge given).

The trial court did not abuse its discretion in allowing the jury to deliberate for 16 hours, even after receipt of Juror Valenzuela's note. Additionally, the trial court's action of returning the jury to deliberate did not coerce Juror Valenzuela or

prevent an impartial verdict from being reached. Therefore, we overrule Martinez's final issue.

The judgment of the trial court is affirmed in all respects.